**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**JOEL E. JIVIDEN,**

      **Plaintiff,**

**v.**                      **Case No.: 3:12-04698**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. This case is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 12, 15).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED**, that the Commissioner's motion for judgment on the pleadings be **GRANTED**, and that this case be **DISMISSED**,

1

**with prejudice,** and removed from the docket of the Court.

## I.     Procedural History

Plaintiff, Joel E. Jividen ("Claimant"), protectively filed the instant DIB application on November 20, 2009, alleging a disability onset date of November 10, 2005. (Tr. at 119). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 54, 62). Claimant filed a request for an administrative hearing, which was held on December 15, 2010 before the Honorable James J. Kent, Administrative Law Judge ("ALJ"). (Tr. at 25-51). By written decision dated December 29, 2010, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 13-20). The ALJ's decision became the final decision of the Commissioner on June 28, 2012, when the Appeals Council denied Claimant's request for review. (Tr. at 1–3). Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, both parties filed memoranda in support of judgment on the pleadings, and the Plaintiff filed a response to the Commissioner's brief. (ECF Nos. 10, 11, 12, 15, 16). Consequently, the matter is fully briefed and ready for resolution.

## II.     Claimant's Background

Claimant was 49 years old at the time he filed the instant application for benefits and 50 years old at the time of his administrative hearing. (Tr. at 29, 119). He graduated from high school and communicates in English. (Tr. at 31). Claimant has prior work experience as an owner and operator of a gas flow service company. (Tr. at 19).

### III.   <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments

do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation

in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through March 31, 2009. (Tr. at 15, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity between his alleged onset date and his date last insured. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ determined that Claimant had the following severe impairments: "osteoarthritis; cervical pain; fibromyalgia; joint pain and weakness in the hands and feet; migraine headaches." (Tr. at 15-16, Finding No. 3). Under the third inquiry, the ALJ determined that Claimant did not have an impairment or combination of

impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 16-17, Finding No. 4). Accordingly, under the fourth inquiry, the ALJ assessed Claimant's RFC, finding that Claimant had:

> [t]he residual functional capacity to perform the full range of medium work as defined in 20 C.F.R. 404.1567(c) except he would only occasionally be able to climb ladders, ropes and scaffolds, ramps and stairs, balance, stoop, kneel, crouch and crawl; he is to avoid concentrated vibration.

(Tr. at 17-19, Finding No. 5). The ALJ then determined that Claimant was capable of performing past relevant work as an owner and operator of a gas flow service company. (Tr. at 19-20, Finding No. 6). Thus, the ALJ concluded that Claimant was not disabled and was not entitled to benefits. (Tr. at 20, Finding No. 7).

## IV.  Claimant's Challenges to the Commissioner's Decision

Claimant raises four challenges to the Commissioner's decision. First, Claimant asserts that the ALJ did not comply with the requirements of SSR 96-8p in determining his RFC. (ECF No. 12 at 2-4). Second, Claimant argues that the ALJ improperly weighed the RFC opinion of his treating physician, Dr. Viridia. (ECF No. 16 at 2-3). Next, Claimant contends that the ALJ did not comply with the requirements of SSR 82-62 in determining that he could perform past relevant work activities. (ECF No. 12 at 5-6). Finally, Claimant argues that the ALJ committed reversible error in failing to order a consultative psychological examination. (*Id.* at 7).

## V.  Relevant Medical History

### A. Medical Treatment Records

#### 1. Dr. Viridia's Treatment Notes

In 2001, Claimant began treatment with Arvind Viridia, M.D., of Cross Lanes Internal Medicine Group. Between August 2006 and December 2009, Dr. Viridia saw

Claimant on a monthly basis. (Tr. at 304-354, 437). During this period, Claimant's chief complaints related to severe back pain, which periodically extended up to his neck and down his lower back. (Tr. at 304-39). Claimant also occasionally reported knee pain, ringing in his ears, muscle spasms, headaches, and numbness in his hands. (*Id.*). In addition, Dr. Viridia documented that Claimant complained of depression/anxiety; however, the notes contain no information regarding the nature or severity of Claimant's psychological symptoms. (*Id.*). Nonetheless, Dr. Viridia did not refer Claimant for psychological evaluation, consultation, or counseling. Treatment notes reflect that Claimant was prescribed various pain medications and anti-depressants and received injections of Depomedrol and Toradol. (*Id.*).

### 2. Spinal MRI and X-Ray Results

Beginning in 1994, Claimant underwent a series of MRI's and x-rays of his spine, none of which demonstrated anything more than mild abnormalities. (Tr. at 349-51, 387-91). Although occurring prior to the alleged disability onset date, Claimant's cervical spine MRI's from 1994, 1995, 2000, and 2002 are noteworthy in that the findings are non-severe and relatively stable. (Tr. at 387-91). On October 5, 2006, Claimant's cervical spine, lumbar spine, and left shoulder were x-rayed, and the studies were interpreted by Timothy A. Conner, M.D. (Tr. at 349-51). Dr. Conner found the cervical spine x-ray to show that Claimant's "vertebral body heights, disc spaces, neural foramina and soft tissues appear normal," indicative of a "negative cervical spine." (Tr. at 349). Claimant's lumbar spine x-ray results revealed "mild degenerative change" but "no acute fracture or dislocation [was] demonstrated," while Claimant's "posterior alignment [was] normal." (Tr. at 350). It was Dr. Conner's impression that Claimant had "no acute processes." (*Id.*). Likewise,

7

Claimant's left shoulder x-ray "demonstrate[d] no definitive radiographic abnormality of the bony architecture or alignment." (Tr. at 351).

### B. Physicians' RFC Opinions

#### 1. State Agency Physician Opinions

On January 22, 2010, Dr. Rogelio Lim, M.D., provided a Physical RFC opinion at the request of the Social Security Administration. (Tr. at 355-62). Based upon his review of the record, including the 2006 x-ray results and Dr. Viridia's treatment notes, Dr. Lim opined that Claimant had the following exertional limitations: He could occasionally lift/carry up to 50 pounds, frequently lift/carry up to 25 pounds, stand and/or walk for a total of about 6 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, and had unlimited ability to push or pull. (Tr. at 356). Dr. Lim restricted all of Claimant's postural limitations, such that he could only occasionally climb (ramps, stairs, ladders, ropes, and scaffolds), balance, stoop, kneel, crouch, and crawl, (Tr. at 357), but opined that Claimant had no manipulative, visual, or communicative limitations. (Tr. at 358-59). Dr. Lim further opined that Claimant had no environmental limitations, except that he should avoid concentrated exposure to vibration. (Tr. at 359). Dr. Lim additionally commented that Claimant's allegations were "not fully credible" and that "multiple allegations [were] out of proportion to objective findings." (Tr. at 362). Specifically, Dr. Lim noted that Claimant "alleges ringing of ears, but neuro [was] intact" and that there were "no objective findings of radiculopathy." (*Id.*).

On March 24, 2010, Dr. A. Rafael Gomez, M.D. endorsed Dr. Lim's RFC Opinion, stating that he "ha[d] reviewed all the evidence in file and the [Physical RFC opinion] of 1/22/10, is affirmed as written." (Tr. at 363).

8

### 2.  Dr. Viridia's RFC Opinion

On May 1, 2009, Dr. Viridia completed a Medical Source Statement, in which he described Claimant's diagnoses and symptoms, as well as provided opinions regarding what Claimant could still do despite his limitations. (Tr. at 437-43). Dr. Viridia diagnosed Claimant with chronic back pain, fibromyalgia, bulging disk, and scoliosis. (Tr. at 437). He listed Claimant's symptoms of joint pain, muscle pain/spasms, weakness in hands and legs, fatigue, ringing in ears, numbness in fingers, and indicated that Claimant experienced constant and severe pain in his back and neck due to the bulging disk, as well as muscle spasms that were exacerbated by weather and physical activity. (*Id.*). Dr. Viridia did not find that any emotional factors contributed to the severity of Claimant's symptoms and functional limitations, and he declined to identify any psychological conditions affecting Claimant's pain. (Tr. at 438).

As for Claimant's RFC, Dr. Viridia opined that Claimant could only sit in a working position at a desk or table for up to 15 minutes before he would need to alter his position by walking about, and that Claimant would need to stand or walk for a period less than 15 minutes before he could return to a seated position. (Tr. at 438-39). Claimant did not need to elevate either leg while sitting, but he could not sit for more than 1 hour during an 8-hour working day. (Tr. at 439). In addition, Dr. Viridia opined that Claimant could only stand or walk about for 30 minutes before he would need to alter positions by lying down or reclining in a supine position and would need to lie down or recline for at least 3 hours before he could return to standing or walking. (Tr. at 439-40). Dr. Viridia further opined that during an 8-hour work day, Claimant would require a rest period in addition to a morning break, a lunch period,

and an afternoon break scheduled at approximately 2 hour intervals, in order to relieve pain arising from his documented medical impairments. (Tr. at 440). Accordingly, Dr. Viridia opined that Claimant would require a cumulative period of 6 hours resting/lying down/reclining in an 8-hour work day. (*Id.*).

Dr. Viridia opined that Claimant could occasionally lift between 1 and 10 pounds, never lift 11 to 50 pounds, occasionally balance while standing/walking on level terrain, and never stoop. (Tr. at 441). Regarding neck posture, Claimant could occasionally flex forward (i.e. look down at his desk), rotate left, and rotate right, but could never flex backward (i.e. look upward toward the ceiling). (*Id.*). Regarding hand manipulation, Dr. Viridia opined the Claimant could occasionally engage in reaching, handling, and fingering with both his left and right hands. (Tr. at 441-42). Claimant did not require an assistive device to aid in walking and standing. (Tr. at 442). Dr. Viridia further opined that Claimant would likely miss work due to his impairments or treatment more than 3 times per month, and that Claimant's condition had existed and persisted with the above-outlined restrictions since June 21, 1981. (Tr. at 443).

## VI.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir.

1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart,* 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock,* 483 F.2d at 775.

**VII.   Analysis**

   **A.   Compliance with SSR 96-8p**

   Claimant argues that the ALJ erred in his RFC assessment by failing to adequately adhere to the requirements of Social Security Ruling 96-8p. (ECF No. 12 at 2-4). Social Security Ruling 96-8p provides guidance regarding the assessment of a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. 1996). RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations and is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it

was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." *Id.* Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. A proper RFC assessment requires the ALJ to "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (e.g. 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the record." *Id.* Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p, 1996 WL 374184, at *7.

Thus, in considering allegations of symptoms such as pain, the RFC assessment must 1) "contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate"; 2) "include a resolution of any inconsistencies in the evidence as a whole"; and 3) "set forth a

12

logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." *Id.* Moreover, the ALJ must discuss "why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* Similarly, the AJL "must always consider and address medical source opinions" in assessing the Claimant's RFC. *Id.* As with symptom allegations, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

Here, Claimant raises two objections to the ALJ's RFC assessment. First, Claimant argues that the ALJ provided inadequate narrative discussion as to how the evidence supported each function comprising the RFC assessment, particularly with respect to Claimant's mental impairments. (ECF No. 12 at 3). Second, Claimant argues that the ALJ failed to conduct the requisite "function by function" assessment to determine Claimant's RFC. (*Id.*). Accordingly, Claimant argues that "it is impossible for any subsequent reviewer to know whether these reductions accounted for the limitations in the claimant's functioning due to his various severe impairments." (ECF No. 16 at 1). After reviewing the ALJ's decision, the undersigned **FINDS** that the ALJ's RFC assessment is properly based on a function-by-function evaluation of Claimant's limitations and includes adequate narrative discussion.

Although Claimant contends that the ALJ's RFC assessment is "simply conclusory and does not contain any rationale or reference to the supporting evidence," (ECF No. 12 at 2), he does concede that "the ALJ summarized the medical evidence" on record during his discussion of Claimant's RFC. (*Id.* at 3). Likewise, Claimant acknowledges that the RFC assessment includes specific functional limitations, but argues that ALJ should have "explain[ed] how this reduction

accounted for the limitations in the claimant's function due to his various severe impairments." (*Id.* at 4). Claimant fails to recognize that "the precise medical evidence relied on for every specific limitation need not be discussed directly in the actual RFC finding," in order to comply with SSR 96-8p. *See Vandervort v. Astrue*, 2013 WL 508987, at *2 (D. Md. Feb. 11, 2013).

The ALJ's overall discussion of Claimant's impairments and corresponding RFC included a thorough review of the objective medical evidence, Claimant's subjective symptoms, the testimony, and the available medical source opinions in accordance with SSR 96-8p. (Tr. at 17-19). The ALJ considered Claimant's testimony as to his diminished concentration, migraine headaches, numbness in his extremities, various pains, and activities of daily living, but found Claimant's credibility to be less than favorable in light of contradictory medical evidence. (Tr. at 18-19). The ALJ observed that Claimant's MRI and x-ray results consistently reflected only mild degenerative changes with respect to his back and spine, commenting that "[e]ven considering the claimant's testimony as to the pain medication and the history of motor vehicle accidents and monthly shots, the imaging techniques and his only conservative treatment do not support his reports of constant pain nor ... is there any support for the complaints of numbness of two years duration in his legs, arms, feet and hands." (Tr. at 19). Regarding Claimant's complaints of migraines, the ALJ noted that Claimant had not been hospitalized or treated by a specialist since 2003; therefore, his complaints of weekly headaches lasting from a half hour to three or four hours were implausible. (Tr. at 19). Taking into account Claimant's less than favorable credibility, the ALJ explicitly gave less weight to Claimant's testimony regarding fibromyalgia pain and his standing and sitting limitations. (*Id.*).

The ALJ then considered the RFC opinions of Claimant's treating physician, Dr. Viridia, as well as state agency physicians, Dr. Lim and Dr. Gomez. (*Id.*). The ALJ rejected Dr. Viridia's RFC opinion as being inconsistent with the objective medical evidence, explaining that the medical imaging did not reveal abnormalities sufficient to warrant Dr. Viridia's extreme limitations on Claimant's ability to sit, stand, and walk, or to support his opinion that Claimant needed to rest six hours out of an eight-hour work day. (*Id.*). Although the ALJ did not reiterate the detailed findings in Dr. Lim and Dr. Gomez's RFC opinions, he did find their function-by-function evaluations to be supported by the evidence and adopted them as his own, identifying the exertional level that corresponded with their assessments of Claimant's ability to carry, lift, stand, sit, walk, push and pull, and adding specific non-exertional limitations identified by the agency experts. (Tr. at 17, 19). In doing so, the ALJ acted consistently with SSR 96-5p, which recognizes that an adjudicator may adopt the opinions of a medical source in their entirety when making the administrative finding of a claimant's RFC. Based upon the ALJ's narrative discussion of the medical evidence as it related to Claimant's descriptions of functional limitations, it is clear the ALJ performed an adequate function-by-function assessment of Claimant's RFC. Moreover, the record as a whole contains substantial evidence to support the ALJ's conclusions.

Similarly, the ALJ did not err in assessing Claimant's limitations with respect to his mental impairment. Although the ALJ did find Claimant's major depressive disorder to be a medically determinable mental impairment, he concluded that it "does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and was therefore nonsevere." (Tr. at 16). When

assessing the severity of Claimant's mental impairment, the ALJ addressed the four broad categories of functional capacity set forth in 20 C.F.R. § 404.1520a, indicating that the record substantiated only mild limitations in each category. The ALJ's conclusion is supported by substantial evidence, as the only mention of depression in the record appears in Dr. Viridia's routine review of systems where he sometimes checked a box indicating reports of "depression/anxiety." (Tr. at 304-43). However, Dr. Viridia never saw fit to conduct a more comprehensive work-up of Claimant's psychological status, refer Claimant to a specialist, order objective testing, or recommend counseling. Claimant received conservative treatment with various psychotropic medications, but never required more intensive treatment, such as hospitalization or crisis management. The record simply does not corroborate any significant functional limitation related to Claimant's depression, or indicate that Claimant's physical impairments were exacerbated by his depression. To the contrary, Dr. Viridia indicated in his RFC opinion that Claimant's emotional factors did **not** contribute to the severity of his symptoms or his functional limitations. (Tr. at 438). Having appropriately found that Claimant's depression "does not cause more than minimal limitation," the ALJ did not err by declining to obtain or conduct a more thorough function-by-function mental RFC assessment of Claimant. *See Hedspeth v. Astrue*, 2012 WL 4017953, at *5 (E.D.N.C. Sept. 12, 2012) ("[B]ecause substantial evidence supports the ALJ's finding that plaintiff's anxiety was not limiting, the court finds that the ALJ did not err by not obtaining a function-by-function mental RFC assessment. . .").

### B.    Weight Given to Treating Physician's RFC Opinion

Claimant argues that by rejecting Dr. Viridia's RFC assessment, the ALJ failed

to follow relevant regulations and rulings regarding the weight that should be given to certain medical sources opinions. (ECF No. 16 at 2-3). Claimant contends that "it was reversible error for the ALJ to assign greater weight to the opinions of nonexamining sources given that they lacked the familiarity and longitudinal perspective available to Dr. Viridia as a result of his longstanding treatment relationship with Claimant. (*Id.*).

Medical source opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2). When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 404.1527(b). The ALJ's responsibility to consider all of the relevant evidence, and not just the medical records and opinions, is particularly important in arriving at a claimant's RFC, which is an administrative determination rather than purely a medical assessment of what an individual can do in a work-related situation. Stated another way, medical source opinions on a claimant's ability to perform certain work-related functions are merely pieces of evidence that must be considered and weighed by the ALJ in conjunction with all of the other evidence when making the administrative determination of a claimant's RFC. SSR 96-5p, 1996 WL 374183, at *5 (S.S.A. 1996).

When weighing medical source opinions, an ALJ should generally give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *See* 20 C.F.R. §§ 404.1527(c)(1). Even greater weight should be

allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 404.1527(c)(2). Indeed, a treating physician's opinion should be given **controlling** weight when the opinion is supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the claimant's case record. *Id.*; *see also* SSR 96-2p, 1996 WL 374188, at \*2 (S.S.A. 1996) (explaining that "'medical opinions' are opinions about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight."). When a treating physician's medical opinion is not afforded controlling weight, the ALJ must analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. § 404.1527(c)(2)-(6),[1] and must explain the reasons for the weight given to the opinions. "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected … In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188 \*4. Nevertheless, a treating physician's opinion may be rejected in whole or in part when there is persuasive contrary evidence in the record. *Coffman v. Brown,* 829 F.2d 514, 517 (4th Cir. 1987). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact,

---

[1] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

weigh opinions, and resolve conflicts of evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Medical source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." SSR 96-5p, 1996 WL 374183, at *2. However, these opinions must still always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *2-3. As explained in SSR 96-5p,

> The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner. If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record.

*Id.* at *3. Further, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184 *7.

Here, the ALJ generally accepted all of Dr. Viridia's opinions regarding the nature and severity of Claimant's medically determinable impairments, finding that his osteoarthritis, cervical pain, fibromyalgia, joint pain and weakness, and migraine headaches were all severe conditions, while his depression was non-severe. On the other hand, after "careful consideration of the entire record," the ALJ rejected *in toto* Dr. Viridia's assessment of what work-related activities Claimant was capable of

doing on a regular and sustained basis. (Tr. at 17). The ALJ explained that he could not adopt Dr. Viridia's limitations on Claimant's ability to sit, stand, and walk because the extreme nature of the restrictions were contrary to the objective medical testing. (*Id* at 19.). Specifically, the ALJ noted that the medical imaging taken of Claimant's spine over a period of 10 years "[did] not reveal noteworthy problems," and Claimant's most recent cervical spine MRI revealed only "a minimal bulging annulus centrally at the C6-7 level only," whereas the 2006 cervical spine x-ray was negative. (*Id.*). The ALJ also took into account the absence of aggressive medical intervention, observing that Dr. Viridia's treatment had been conservative, which was inconsistent with the extensive limitations identified by Dr. Viridia in the RFC assessment.

Based upon a review of the evidence, the undersigned **FINDS** that the ALJ acted appropriately in refusing to accord controlling weight to the RFC opinions of Dr. Viridia. On the RFC assessment form, Dr. Viridia identified positive objective findings supporting Claimant's diagnoses and functional restrictions; however, these findings do not appear anywhere in Dr. Viridia's contemporaneous office notes. To the contrary, the office notes consist primarily of subjective complaints made by Claimant accompanied by sparse medical observations. (Tr. at 304-43). At no place in the office notes does Dr. Viridia document objective findings such as joint warmth, redness, swelling, muscle weakness, muscle atrophy, grip strength, range of motion testing, or descriptions of gait or posture. The vast majority of the notes are dedicated to listing Claimant's descriptions of pain and his medications. The absence of clinical and diagnostic data supportive of Dr. Viridia's opinions regarding the extent of Claimant's functional limitations provides a legitimate reason under the regulations

and rulings for the ALJ to discount their accuracy. Moreover, although Claimant had worked continuously until 2005, Dr. Viridia indicated that Claimant had suffered from these limitations since June 1981—a date no doubt supplied by Claimant as Dr. Viridia did not initiate treatment until 2001. This statement alone undermines confidence in the objectivity and accuracy of Dr. Viridia's RFC assessment.

Having concluded that the ALJ complied with the applicable regulations in his refusal to give controlling weight to Dr. Viridia's opinion, the Court next examines whether the ALJ adequately articulated his reasons for the weight allocated to the medical opinions. As Claimant points out, the ALJ did not provide an analysis in the written decision of the factors set forth in 20 C.F.R. § 404.1527(c). Nevertheless, the Court does not find the absence of specifics regarding each factor to constitute error requiring a remand of the Commissioner's decision. Although 20 C.F.R. § 404.1527(c) provides that, in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulation does not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulation mandates only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. Social Security Ruling 96-2p provides additional clarification of the ALJ's responsibility to give good reasons, stating:

> When the determination or decision: is not fully favorable, e.g., is a denial ... the notice of determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

Courts addressing this duty have taken different approaches on what and how much

the ALJ must include in the written opinion to constitute an adequate explanation. *See Tucker v. Astrue,* 897 F.Supp.2d 448, 468 (S.D.W.Va. 2012) (collecting cases). However, the undersigned agrees with the position that while the ALJ must consider the factors, he is not required to discuss each one in his opinion so long as a subsequent reviewer is able to understand the weight given to the opinions and the reasons for that weight. *Oldham v. Astrue,* 509 F.3d 1254, 1258 (10th Cir. 2007); *see also Green v. Asrue,* 558 F. Supp.2d 147, 155 (D. Mass. 2008). Here, the ALJ made it abundantly clear that the marginal findings on medical imaging and the lack of aggressive treatment were incongruous with the extreme limitations suggested by Dr. Viridia, but were consistent with the exertional and non-exertional restrictions identified by the agency consultants. Agency consultants "are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6P, 1996 WL 374180, at *3 (S.S.A. 1996). Opinions from agency consultants must be given weight when they are supported by evidence in the case record, and "[i]n appropriate circumstances ... may be entitled to greater weight than the opinions of treating or examining sources." *Id.,* at *3. Here the ALJ found the evidence to be supportive and consistent with the opinions of the agency experts and provided his rationale for that conclusion. Accordingly, the undersigned **FINDS** the ALJ's explanation of the weight given to the medical opinions to be sufficient.

### C.     Claimant's Ability to Perform Past Relevant Work

Claimant argues that the ALJ, in determining that he was capable of performing past relevant work, failed to provide "specific findings or analysis regarding the physical and mental demands of this work, as required by SSR 82-62."

(ECF No. 12 at 5). Claimant contends that the ALJ "failed to question the claimant about the demands of his past work," and also "failed to question the VE regarding his findings on how the claimant actually performed this work." (*Id.* at 6). These claims are without merit.

Social Security Ruling 82-62 provides instruction as to how the ALJ will determine whether a claimant has the capacity to perform past relevant work. SSR 82-62, 1982 WL 31386 (S.S.A. 1982). As with all decisions, the ALJ's rationale "must be written so that a clear picture of the case can be obtained." *Id.* at *4. SSR 82-62 further requires the ALJ to make three specific findings of fact in determining that a claimant has the capacity to perform a past relevant job: (1) a finding as to the individual's RFC; (2) a finding as to the physical and mental demands of the past job/occupation; and (3) a finding that the individual's RFC would permit a return to his or her past job or occupation. *Id.* In making these findings, "[t]he claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work." *Id.* at *3. Additionally, the ALJ is instructed to conduct "a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employer, the *Dictionary of Occupational Titles*, ["DOT"], etc., on the requirements of the work as generally performed in the economy." *Id.*

In this case, the ALJ made all three requisite findings in determining that Claimant could perform past relevant work. First, as discussed above, the ALJ appropriately determined Claimant's RFC. (Tr. at 17-19). Second, the ALJ found that Claimant's "past relevant work as an owner and operator, were both light in exertion according to the DOT" and that his work as an owner was skilled in nature, while his clerical work was semi-skilled in nature. (Tr. at 20). Finally, in comparing Claimant's RFC with the physical and mental demands of his past work, the ALJ specifically relied upon the testimony of the vocational expert to "find that the claimant was able to perform it as generally performed." (*Id.*). Based upon this finding, the ALJ determined that Claimant was not under a disability.

Claimant's first objection, that the ALJ failed to question him regarding the physical and mental demands of his work, is plainly contradicted by the record. During the administrative hearing, the ALJ specifically asked Claimant about his prior day-to-day job duties, as well as the difficulties that led to him cease working. (Tr. at 31-33). Claimant testified to sorting the mail, running an integrator and the physical mechanics that entailed, bending over a desk all day, reviewing other people's work, and managing four to five employees. (Tr. at 31-32). Claimant testified that "bending over reading the charts was making [his] neck hurt" so much that he was unable to concentrate, and that as a result he missed a lot of work, which caused both his employees and his customers to leave. (Tr. at 33). This testimony is consistent with the Work Activity Report that Claimant submitted as part of his initial application for benefits. (Tr. at 161-72). Clearly, the ALJ did not fail to question Claimant regarding the demands of his past work.

24

Claimant also contends that the ALJ erred by failing to ask the Vocational Expert ("VE") about how Claimant actually performed his work, as opposed to how the work is generally performed. (ECF No. 12 at 6). However, the VE explicitly testified as to how Claimant's past work as it was actually performed differed from how it is generally performed, explaining that Claimant "described both of the jobs as lifting as a maximum of 10 pounds; but according to the DOT, they're in the light level." (Tr. at 48). The VE further testified that "[w]hen [Claimant] was the owner of the gas flow service, that's skilled light work with occasional reaching, handling, fingering; frequent talking, hearing, and seeing. When he was doing more of the clerical aspects, that's semiskilled light work with frequent reaching/handling, occasional fingering." (*Id.*). Moreover, Claimant fails to recognize that the regulations permit the VE to testify regarding "whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, *either as the claimant actually performed it or as generally performed in the national economy*." 20 C.F.R. § 404.1560(b)(2) (emphasis added); see also *Lowery v. Comm'r*, 2013 WL 1775450, at *3 (D. Md. Apr. 24, 2013). Here, the ALJ appropriately asked the VE if someone with the same age, education, work experience, and RFC as Claimant would "be able to perform Claimant's past work, either as it's actually performed or as generally performed per the DOT," to which the VE responded affirmatively.

The ALJ need not recite the entire administrative record in order for the Court to affirm his determination regarding Claimant's ability to perform past relevant work. Although brief, the ALJ's discussion of Claimant's past relevant work includes the requisite findings, while his rationale "follow[s] an orderly pattern and show[s]

clearly how specific evidence leads to [his] conclusion." SSA 82-62, 1982 WL 31386, at *4. Accordingly, the undersigned **FINDS** that the ALJ's decision adequately complies with the requirements of SSA 82-62. Moreover, the record contains substantial evidence, in the form of testimony from Claimant and the VE as well as written statements by Claimant, to support the ALJ's determination that Claimant's RFC did not prevent him from doing past relevant work as it is generally performed.

### D. Consultative Examination

Finally, Claimant contends that the ALJ erred in failing to order a psychological consultative examination. (ECF No. 12 at 7). Claimant testified to taking Lexapro and Cymbalta during the administrative hearing and "reported symptoms from depression throughout the record." (ECF Nos. 12 at 7; 16 at 4). Claimant argues that the ALJ, having determined Claimant's major depressive disorder to be a medically determinable impairment, should have ordered a consultative examination before finding that the impairment was not severe. (ECF No. 12 at 7). The Commissioner objects to Claimant's assignment of error, arguing that "the mere fact that Plaintiff had been prescribed antidepressants is not enough to require the ALJ to order a psychological evaluation." (ECF No. 15 at 11).

The decision to order a consultative examination may only be made after the ALJ "consider[s] not only existing medical reports, but also the disability interview form containing [the claimant's] allegations as well as other pertinent evidence in [his] file." 20 CFR § 404.1519a(a). A consultative examination may be necessary "to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow [the ALJ] to make a determination or decision" on a claim. *Id.* § 404.1519a(b). After reviewing the record, the undersigned finds that the ALJ did not

err in declining to order a psychological consultative examination.

Although Claimant did testify to taking Cymbalta and Lexapro at the administrative hearing, he offered no testimony at all regarding symptoms or difficulties relating to depression. Likewise, in Claimant's initial disability interview form, he identified only physical conditions limiting his ability to work, (Tr. at 141), and in his appeal report, he again identified only physical limitations. (Tr. at 201). As discussed above, Dr. Viridia's records from the relevant period do not appear to include any specific complaints by Claimant relating to his depression, nor do they reflect any serious concern regarding Claimant's mental health. (Tr. at 305-43). Dr. Viridia never referred Claimant for psychological evaluation or treatment, nor did Claimant supply any other records suggesting the existence of a severe mental impairment. Moreover, as discussed above, Dr. Viridia did not consider Claimant's emotional factors to contribute to the severity of his symptoms and functional limitations, or to affect his pain. (Tr. at 438). The ALJ accepted that opinion as controlling. Therefore, the information on record regarding the severity of Claimant's mental impairment was consistent and unambiguous. In addition, the ALJ had relevant statements from both Claimant and Claimant's treating physician that were sufficient to establish that Claimant's mental impairment did not in any discernible way affect his ability to work.

The evidence on record regarding Claimant's psychological impairment was neither inconsistent nor insufficient to allow the ALJ to conclude that Claimant's depression was a non-severe impairment that did not affect his RCF. Therefore, the undersigned **FINDS** that ALJ was not required to order a psychological consultative examination.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's motion for a remand as articulated in his Brief in Support of Judgment on the Pleadings, (ECF No. 12), **GRANT** Defendant's motion for judgment on the pleadings, (ECF No. 15), **DISMISS** this action, **with prejudice,** and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  July 15, 2013.

Cheryl A. Eifert
United States Magistrate Judge